# 11-3303-cv

## United States Court of Appeals
### for the
## Second Circuit

CHRISTIAN LOUBOUTIN S.A., CHRISTIAN LOUBOUTIN, L.L.C.,
CHRISTIAN LOUBOUTIN,

*Plaintiffs-Counter-Defendants-Appellants,*

– v. –

YVES SAINT LAURENT AMERICA HOLDING, INC., YVES SAINT LAURENT S.A.S.,
YVES SAINT LAURENT AMERICA, INC.,

*Defendants-Counter-Claimants-Appellees,*

YVES SAINT LAURENT (an unincorporated association), JOHN DOES, A TO Z
(unidentified), JANE DOES, A TO Z (unidentified), XYZ COMPANIES, 1 TO 10
(unidentified),

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF *AMICUS CURIAE* TIFFANY (NJ) LLC AND TIFFANY AND COMPANY IN SUPPORT OF APPELLANTS' APPEAL SEEKING REVERSAL OF THE DISTRICT COURT'S DECISION DENYING APPELLANTS' MOTION FOR PRELIMINARY INJUNCTION

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
RICHARD Z. LEHV
JASON D. JONES
866 United Nations Plaza
New York, New York 10017
(212) 813-5900

*Counsel for Amicus Curiae Tiffany (NJ) LLC
and Tiffany and Company*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amicus curiae* Tiffany (NJ) LLC and Tiffany and Company state that Tiffany (NJ) LLC is a wholly-owned subsidiary of Tiffany and Company, which in turn is wholly owned by Tiffany & Co., a Delaware corporation that is publicly traded on the New York Stock Exchange. Tiffany (NJ) LLC and Tiffany and Company have no other publicly traded corporate affiliates.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ...........................................1

SUMMARY OF ARGUMENT ...............................................................4

ARGUMENT .........................................................................5

I.   General Legal Principles and the Applicable Burden of Proof........................5

II.  The District Court's Creation of a *Per Se* Rule
     That "Use of A Single Color For Fashion Items" Can *Never*
     Be a "Valid Mark" Is Not Supported by the Language of the
     Lanham Act or Any Controlling Legal Precedent and Should Be
     Rejected By This Court.......................................................7

III. The District Court Incorrectly Analyzed
     the Utilitarian Functionality Defense .........................................13

     A.  The "Essential to the Use or Purpose" Prong...........................14

     B.  The "Affects the Cost or Quality" Prong ..............................16

IV.  To The Extent the Court Found the Red Sole Mark To Be
     Aesthetically Functional, It Incorrectly Analyzed this Defense .....................18

CONCLUSION .....................................................................22

# TABLE OF AUTHORITIES

## CASES

*Brandir International, Inc. v. Cascade Pacific Lumber Co.*,
    834 F.2d 1142 (2d Cir. 1987) ...............................................................15

*Burberry Ltd. v. Euro Moda, Inc.*,
    No. 08 Civ. 5781, 2009 WL 1675080 (S.D.N.Y. June 10, 2009) ......................11

*Christian Louboutin S.A. v. Yves Saint Laurent America, Inc.*,
    778 F. Supp. 2d 445 (S.D.N.Y. 2011) ....................................................1

*In re Corning Glass Works*,
    6 U.S.P.Q.2d 1032 (T.T.A.B. 1988) ......................................................12

*Kellogg Co. v. National Biscuit Co.*,
    305 U.S. 111 (1938) ............................................................................17

*Knitwaves, Inc. v. Lollytogs Ltd.*,
    71 F.3d 996 (2d Cir. 1995) ............................................................19, 20

*Lane Capital Management, Inc. v. Lane Capital Management, Inc.*,
    192 F.3d 337 (2d Cir. 1999) ..................................................................6

*LeSportsac, Inc. v. Kmart Corp.*,
    754 F.2d 71 (2d Cir. 1985) ..................................................................15

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    454 F.3d 108 (2d Cir. 2006) ................................................................11

*Monserrate v. New York State Senate*,
    599 F.3d 148 (2d Cir. 2010) ..................................................................7

*Pagliero v. Wallace China Co.*,
    198 F.2d 339 (9th Cir. 1952) ..............................................................19

*In re Paramount Pictures Corp.*,
    217 U.S.P.Q. 292 (T.T.A.B. 1983) .........................................................12

*Qualitex Co. v. Jacobson Products Co.*,
    514 U.S. 159 (1995) ..................................................................... *passim*

*Stormy Cline Ltd. v. ProGroup, Inc.*,
    809 F.2d 971 (2d Cir. 1987) ......................................................... *passim*

*Telebrands Corp. v. Del Laboratories, Inc.*,
719  F. Supp. 2d 283 (S.D.N.Y. 2010) ................................................................6

*Villeroy & Boch Keramische Werke K.G. v. THC Systems Inc.*,
999 F.2d 619 (2d Cir. 1993) ....................................................................16, 20

*Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*,
644 F.2d 769 (9th Cir. 1981) ............................................................................18

*Wallace International Silversmiths, Inc. v. Godinger Silver Art Co.*,
916 F.2d 76 (2d Cir. 1990) ................................................................... *passim*

*Zino Davidoff SA v. CVS Corp.*,
571 F.3d 238 (2d Cir. 2009) ............................................................................7

## RULES

Fed. R. App. P. 29(c)(5) ....................................................................................1

Second Circuit Rule 29.1(b) ..............................................................................1

## STATUTES

15 U.S.C. § 1052(f) ..........................................................................................10

15 U.S.C. § 1115(a) ............................................................................................6

15 U.S.C. § 1127 ..............................................................................................10

## TREATISES

1 J. Thomas McCarthy,
MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:24 (2011) ..........12

1 J. Thomas McCarthy,
MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:44.50 (2011) .......3

1 J. Thomas McCarthy,
MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:67 (2011) ..........14

1 J. Thomas McCarthy,
MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:69 (2011)...7, 13, 15

1 J. Thomas McCarthy,
MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:72 (2011) ...........6

1 J. Thomas McCarthy,
McCarthy On Trademarks and Unfair Competition § 7:79 (2011) ..........14

1 J. Thomas McCarthy,
McCarthy On Trademarks and Unfair Competition § 7:80 (2011)..........20

## PERIODICALS

Kimberly Stevens, *All In the Presentation? Odes To The Little Blue Box*,
N.Y. Times, Jan. 2, 2000...........................................................................2

Suzy Menkes, *Tiffany, In New Packaging*,
N.Y. Times, Sept. 12, 2006......................................................................2

Wendy Moonan, *A 128-Carat Diamond, But No Holly Golightly
or Sterling Phone Dialer*, N.Y. Times, June 30, 2006 .........................2

Tiffany (NJ) LLC and Tiffany and Company submit this brief as *amicus curiae* in support of the appeal of appellants Christian Louboutin S.A., Christian Louboutin S.A., L.L.C., and Christian Louboutin (together, "Louboutin") seeking reversal of the August 10, 2011 Order of the United States District Court for the Southern District of New York, denying Louboutin's motion for a preliminary injunction. *Christian Louboutin S.A. v. Yves Saint Laurent Am., Inc.*, 778 F. Supp. 2d 445 (S.D.N.Y. 2011) (hereinafter referred to as "Op.")[1]

All parties have consented to the filing of this *amicus curiae* brief.

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

Founded in 1837, Tiffany and Company is one of the most famous manufacturers and retailers of jewelry in the world. In addition to jewelry, it sells silver flatware, china, glassware, watches, leather goods, fragrances, fashion accessories such as scarves and handbags, and a wide variety of other luxury goods

---

[1] Pursuant to Fed. R. App. P. 29(c)(5) and Circuit Rule 29.1(b), Tiffany states that no party's counsel authored this brief in whole or in part. However, counsel for Tiffany, Fross Zelnick Lehrman & Zissu, P.C. ("Fross Zelnick"), represented Christian Louboutin before the United States Patent and Trademark Office in 2008 in securing the "Red Sole Mark" registration at issue in this action and in filing other trademark applications. Fross Zelnick did not represent Louboutin in the infringement action in the court below or assist or participate in that action or this appeal. Fross Zelnick, which has been representing Tiffany in trademark matters for decades (and which represented Tiffany in securing the trademark registrations for the "Tiffany blue" color described in this brief), was contacted independently by Tiffany (without any awareness of Fross Zelnick's trademark work for Louboutin) to draft and submit this *amicus curiae* brief on behalf of Tiffany. Fross Zelnick drafted this *amicus curiae* brief without collaboration with, or assistance from, Louboutin's counsel. No party or its counsel contributed money that was intended to fund preparing the brief. Other than Tiffany, no person contributed money that was intended to fund preparing and submitting this brief.

1

and gift items. In the United States, TIFFANY branded goods can be purchased at 87 Tiffany stores or online at www.tiffany.com.

Tiffany (NJ) LLC owns the Tiffany trademarks and Tiffany and Company operates the Tiffany retail stores and website. For the sake of simplicity, both *amicus curiae* are referred to collectively in this brief as "Tiffany."

In advertising and packaging its products, Tiffany uses a distinctive shade of blue, similar to robin's-egg blue. Specifically, once a consumer purchases an item from a Tiffany store or on-line, the product is packaged in a robin's-egg blue box. Tiffany uses the same shade of blue on shopping bags, on the cover of its mail-order catalogs, in the background of much of its advertising, on its annual reports to shareholders and other publications, on its website, and in countless other ways. Tiffany has recently begun using its signature blue color on jewelry and on its fashion accessories, including gloves, scarves and handbags.

The blue Tiffany box is so well known that consumers instantly associate it with Tiffany. *See, e.g*., Kimberly Stevens, *All In the Presentation? Odes To The Little Blue Box*, N.Y. TIMES, Jan. 2, 2000, § 14, at 6 (discussing the "famous 'Tiffany blue' boxes"); Wendy Moonan, *A 128-Carat Diamond, But No Holly Golightly or Sterling Phone Dialer*, N.Y. TIMES, June 30, 2006, at E30 (stating that "the world" is "familiar with Tiffany's signature blue box"). Similarly, the blue color is so inextricably associated with Tiffany that consumers refer to it as "Tiffany blue." *See*, *e.g.,* Suzy Menkes, *Tiffany, In New Packaging*, N.Y. TIMES, Sept. 12, 2006, http://www.nytimes.com/2006/09/12/style/12iht-rtiffany.2782763.html (discussing the "famous 'Tiffany Blue' color"). Indeed, the

Pantone Matching System has given that color its own Pantone number, Pantone 1837, which it calls "Tiffany Blue." The number "1837" was chosen because that is the year Tiffany was founded. And the leading trademark treatise cites Tiffany blue as one example of "single color registrations for widely-known marks." 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:44.50 at 7-119 (4th ed. 2011) (hereinafter "MCCARTHY").

In addition to a United States Trademark and Service Mark Registration for the blue box with a white ribbon (Registration No. 2,184,128), Tiffany (NJ) LLC owns three U.S. Trademark and Service Mark Registrations for the robin's-egg blue color *per se*, as used on boxes (Reg. No. 2,359,351), on shopping bags (Reg. No. 2,416,795), and on the cover of catalogs (Reg. No. 2,416,794).

Tiffany has an obvious in interest in protecting its marks, including the Tiffany blue color, from infringers and counterfeiters.

Tiffany files this *amicus curiae* brief because the District Court's opinion in this case adopted a sweeping and unprecedented *per se* rule against granting trademark protection to *any* single color that is used on *any* "fashion item," even where the color has achieved "secondary meaning" and is associated with a single brand. *Amicus curiae* respectfully submit that adoption of such a blanket rule was unnecessary to a resolution of the preliminary injunction motion below and should be rejected by this Court. As the Supreme Court and this Court have made clear, whether any given mark has achieved secondary meaning or is subject to a defense of functionality is to be decided on a case by case basis, and there is no need to issue a broad edict forbidding trademark protection for color marks in an entire

3

industry.   Further, this Court has held that functionality is to be decided only after other issues, such as likelihood of confusion, have been resolved.  Accordingly, the District Court should have attempted to resolve the preliminary injunction motion on narrower grounds, and had no need for the broad rule it adopted.

Tiffany therefore urges this Court to reject the District Court's adoption of sweeping *per se* rules concerning the protectibility and functionality of single colors in the fashion industry, and instead reaffirm and endorse a case-by-case analysis of these issues.

## SUMMARY OF ARGUMENT

In denying Louboutin's preliminary injunction motion, the District Court held that Louboutin was "unlikely to be able to prove that its red outsole brand is entitled to protection, even if it has gained enough public recognition in the market to have acquired secondary meaning."  Op. at 449.  The District Court held that Louboutin's mark is not protectible because it is "ornamental" and "functional."

The District Court first held that Louboutin's "Red Sole Mark" was not a "valid mark," because it is "ornamental," even though the mark has been registered with the United States Patent and Trademark Office (the "USPTO") and even though the mark has acquired secondary meaning in the minds of the consuming public.  The District Court reached this conclusion not by analyzing whether the Red Sole Mark itself is a "valid mark" as used by Louboutin on its footwear, but rather by looking at the "fashion world" generally and adopting an unprecedented *per se* rule that a "single color" can *never* constitute a protectible trademark when used on *any* "article of wear produced in the fashion industry."  The adoption of

this sweeping and overbroad rule is not the appropriate method of analyzing the validity of a trademark, is not supported by the language of the Lanham Act or case law, and was not necessary to reach a decision on the preliminary injunction motion. Accordingly, this *per se* rule should be rejected by this Court.

Next, the District Court held that the Red Sole Mark is "functional." In holding that the mark is functional, the District Court failed to apply correct legal standards for determining whether a trademark is functional. The District Court did not analyze whether the mark at issue (the Red Sole Mark) is functional in that it lowers the cost of manufacturing shoes or raises their quality, or whether the Red Sole Mark is essential to the use and purpose of shoes. Nor did the District Court analyze whether competitors need to copy Louboutin's Red Sole Mark to compete in the designer footwear market. Instead, the Court again appears to have relied on generalities about the "fashion industry" as a whole—analyzing whether the use of a single color is "functional" when used on "fashion items." Such a general and overbroad *per se* analysis of functionality disregards controlling precedent, and should not be endorsed by this Court.

## ARGUMENT

### I. General Legal Principles and the Applicable Burden of Proof

The court below gave this statement of the issue raised by the preliminary injunction motion:

> The narrow question presented here is whether the Lanham Act extends protection to a trademark composed of a single color used as an expressive and defining quality of an article of wear produced in the fashion industry.

Op. at 451.

*Amicus curiae* respectfully submit that the foregoing is not a "narrow question" but a broad one, and was not necessary or appropriate to ask or answer in resolving the preliminary injunction motion.

To prevail on a trademark infringement claim, a plaintiff must first show that it (1) has a valid, legally protectible mark and (2) that defendant's subsequent use of a similar mark is likely to create confusion as to the origin of the products at issue. *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999). As to the first element, when a plaintiff owns a certificate of registration for its mark from the USPTO—as Louboutin does for its Red Sole Mark—such registration constitutes "prima facie evidence that the mark is registered and valid (i.e., protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Id*. at 345 (citing 15 U.S.C. § 1115(a)). As a result, when a plaintiff sues for infringement of a registered mark, the defendant bears the burden to rebut the presumption of the mark's validity by a preponderance of the evidence. *Id*.

Even if a plaintiff succeeds in showing that its mark is valid and that there is a likelihood of confusion, a defendant can still avoid liability for infringement if it is able to demonstrate that the plaintiff's mark is "functional." *See, e.g., Stormy Cline Ltd. v. ProGroup, Inc*., 809 F.2d 971, 974 (2d Cir. 1987). Where, as here, the plaintiff is suing for infringement of a registered mark, the burden to prove that a mark is functional is on the defendant. *Telebrands Corp. v. Del Labs., Inc*., 719 F. Supp. 2d 283, 299 (S.D.N.Y. 2010); *see also* 1 McCarthy § 7:72 at 7-214.

6

As to the order in which these issues are to be decided, Professor McCarthy explains: "[T]he Second Circuit has said that a court should first decide on the issues [of validity of the mark] and likely confusion and only if a prima facie case is established then proceed to the defense of functionality." 1 MCCARTHY § 7:69 at 7-196 (citing *Stormy Cline,* 809 F.2d 971).

In addition to the forgoing issues, the preliminary injunction motion involved additional issues: whether the plaintiff can establish "(1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in [its favor]." Op. at 450 (citing *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 154 (2d Cir. 2010) and *Zino Davidoff SA v. CVS Corp.,* 571 F.3d 238, 242 (2d Cir. 2009)).

Thus, there were numerous issues to be resolved in the court below on the preliminary injunction motion, and therefore there was no need to resolve the motion only by adopting a broad rule against protection of color as a trademark on any "article of wear" in the "fashion industry."

## II. The District Court's Creation of a *Per Se* Rule That "Use of A Single Color For Fashion Items" Can *Never* Be a "Valid Mark" Is Not Supported by the Language of the Lanham Act or Any Controlling Legal Precedent and Should Be Rejected By This Court

The District Court appears to have first analyzed whether Louboutin's Red Sole Mark was a "valid" (i.e., legally protectible) trademark. Op. at 453 (stating that the Court was considering "[t]he question of whether use of a single color in the fashion industry can constitute a valid mark . . . .").

As the District Court acknowledged, the Supreme Court has held that a color (even a single shade) can be a valid trademark "'where that color has attained 'secondary meaning' and therefore identifies and distinguishes a particular brand (and thus indicates its 'source').'" Op. at 450 (quoting *Qualitex Co. v. Jacobson Prods. Co*., 514 U.S. 159, 161 (1995)). Moreover, the District Court appears to have acknowledged that Louboutin's Red Sole Mark, in fact, has acquired secondary meaning, holding that "the red outsole became closely associated with Louboutin," that there is a "broad association of the high fashion red outsole with [Louboutin] as its source," that Louboutin has "transform[ed] the staid black or beige bottom of a shoe into a red brand with a worldwide recognition at the high end of women's wear, a product so visually eccentric and striking that it is easily perceived and remembered," and that when consumers see red soles on high-fashion footwear, "cognitive bulbs instantly flash to associate: 'Louboutin.'" Op. at 448.

Finally, the District Court acknowledged that Louboutin has received a registration from the USPTO for its Red Sole Mark and, thus, there is a statutory presumption that the mark is protectible under the Lanham Act. Op. at 450.

The District Court nevertheless held that Louboutin's Red Sole Mark was *not* a valid and legally protectible trademark because, according to the District Court, there is "something unique about the fashion world that militates against extending trademark protection to a single color." Op at 451. In other words, rather than analyze whether the particular Red Sole Mark at issue in this case was protectible as used by Louboutin on its shoes (*i.e*., whether it identifies and

distinguishes Louboutin as the source), the District Court adopted an unprecedented and sweeping rule that the Lanham Act *per se* prohibits the "recognition of a trademark for the use of a single color for fashion items," even if that color has acquired secondary meaning. Op. at 457. In short, the District Court carved out an exception to the protections afforded to color trademarks by the Lanham Act and by the Supreme Court in *Qualitex,* holding that a "single color for fashion items" is never subject to protection.

The District Court's generalized discussion of the use of color in the entire "fashion industry," (Op. at 452), is not the correct analysis of trademark validity. The proper inquiry is whether *the particular mark at issue* has been registered with the USPTO and whether *the particular mark* has acquired secondary meaning. *See, e.g., Qualitex*, 514 U.S. at 166 (in determining that green-gold color used on dry cleaning press pads was a valid trademark, the Court analyzed whether the particular color was registered with the USPTO and whether the particular color had obtained secondary meaning such that the color indicated source of the pads).

Here, the Court acknowledged that the Red Sole Mark is registered with the USPTO and that the mark has achieved secondary meaning. Op. at 448-50. Accordingly, there was no reason for the court to discuss the "fashion industry" in general or to find that color plays a "unique role" in that industry such that every designer should be able to "choose color from every streak of the rainbow." Op. at 452-53. As such, this Court should reject the District Court's sweeping analysis of the protectibility of a "use of a single color for fashion items" in favor of a case-

by-case analysis of whether a particular color mark as used on the particular product at issue is valid.

Moreover, the *per se* rule adopted by the District Court finds no support in the language of the Lanham Act. There is nothing in the Lanham Act that carves out from trademark protection the use of a "single color" that has acquired secondary meaning when used on "fashion items"—and the District Court did not cite to any such provision. To the contrary, as the Supreme Court explained in *Qualitex*, the universe of matter that can constitute a protectible mark is extremely "broad" and "not restrictive," so long as the mark is capable of indicating the source of a seller's goods. Specifically, the Court stated:

> Both the language of the [Lanham] Act and the basic underlying principles of trademark law would seem to include color within the universe of things that can qualify as a trademark. The language describes the universe in the broadest terms. It says that trademarks 'include *any* word, name, symbol or device, or any combination thereof.' Since human beings might use as a 'symbol' or 'device' *almost anything at all* that is capable of carrying meaning, this language, read literally, is not restrictive.

*Qualitex*, 514 U.S. at 162 (quoting 15 U.S.C. § 1127) (emphasis added).

Further, the Lanham Act provides that, unless a specific mark is proven to be "functional" (or is unregistrable based on other explicit exceptions not relevant here):

> *[N]othing* . . . shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce.

15 U.S.C. § 1052(f) (emphasis added); *see also Qualitex*, 514 U.S. at 171.

As such, there is simply nothing in the language of the Lanham Act that would *per se* preclude granting trademark protection to a single color that has acquired secondary meaning when used on a fashion item. Thus, it appears the District Court's decision has unilaterally and impermissibly rewritten portions of the Lanham Act.

Nor does the District Court's *per se* rule find support in any controlling case law. Nothing in the Supreme Court's *Qualitex* decision carves out a *per se* exception for the protection of a single color as a trademark in the "fashion world." Nor have any cases in the Second Circuit created an exception to the Lanham Act for the "fashion world." To the contrary, marks consisting of various colors and combinations of colors on fashion items have been held protectible against infringers in this Circuit. *See, e.g., Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108 (2d Cir. 2006); *Burberry Ltd. v. Euro Moda, Inc.*, No. 08 Civ. 5781, 2009 WL 1675080 (S.D.N.Y. June 10, 2009).

Finally, the apparent reasoning behind the District Court's adoption of this *per se* rule has been rejected. According to the District Court, in "fashion markets," color "serves not *solely* to identify sponsorship or source," but also serves an "ornamenting" and "decorative" role in making fashion items pleasing to the eye and, thus, can "advance expressive, ornamental and aesthetic purposes" too. Op. at 451, 454 (emphasis added). In other words, according to the District Court, because a single color serves the "nontrademark" purposes of decoration or ornamentation of a fashion item, the same single color *per se* cannot simultaneously serve the trademark function of identifying the source of a fashion

item.  Op. at 452 (concluding that, when it comes to fashion items, color "performs a creative function; it aims to please or be useful, not to identify and advertise a commercial source.")  But this proposition has been squarely rejected.

According to the leading trademark treatise:  "Merely because a symbol may be pleasing to the eye, and is a decorative feature, does not necessarily mean that the symbol cannot also serve a trademark purpose."  1 MCCARTHY § 7:24 at 7-56; *see also Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 81-82 (2d Cir. 1990) (recognizing that a "strictly ornamental" baroque design pattern on silverware can simultaneously serve to identify source of the goods); *In re Paramount Pictures Corp.*, 217 U.S.P.Q. 292, 293 (T.T.A.B. 1983) (design mark that included words STAR TREK and a picture from a STAR TREK television episode deemed registrable for towels and sheets even if it constitutes "ornamention" because "the Lanham Act does not exclude registration of a mark simply because it has an ornamental as well as a source indicating purpose."); *In re Corning Glass Works*, 6 U.S.P.Q.2d 1032, 1033 (T.T.A.B. 1988) ("A design which has ornamental value may nevertheless be registered if it also functions as a trademark.")

In short, "[t]he best marks are those that combine visually attractive 'ornamentality' with the trademark purpose of identification of source and quality."  1 MCCARTHY § 7:24 at 7-57.  In fact, here the District Court found that Louboutin's Red Sole Mark achieved both of these purposes.  According to the District Court, the Red Sole Mark is "eccentric and striking," turning the outsole of Louboutin's heels into "an object of beauty," while at the same time being "easily

perceived and remembered," so as to cause consumers' "cognitive bulbs instantly [to] flash to associate" the heels with Louboutin. Op. at 448, 454. Accordingly, the District Court's sweeping conclusion that *any* "single color" as used on *any* "fashion item" can *never* serve as a source-identifier must be rejected.

*     *     *

In sum, whether a single color trademark is valid and legally protectible is a fact-intensive question that must be analyzed on a case-by-case basis to examine, *inter alia*, whether the *particular* mark at issue is registered and whether the *particular* mark has acquired secondary meaning among the relevant consuming public, and thereby identifies a single source. There is not (and there ought not be) a *per se* blanket rule in trademark law that precludes single colors from being valid trademarks in the fashion industry (or any industry), and this Court should reject the District Court's adoption of such a sweeping rule.

## III. The District Court Incorrectly Analyzed the Utilitarian Functionality Defense

As noted above, after discussing the validity of the plaintiff's mark, the District Court should next have addressed the issue of likelihood of confusion. 1 MCCARTHY § 7:69 at 7-196 (citing *Stormy Cline,* 809 F.2d 971, for the proposition that a court should first analyze trademark validity and likelihood of confusion to determine whether it even needs to reach the functionality defense). Here, the District Court did not discuss likelihood of confusion, even though Defendants denied all of Louboutin's allegations on likelihood of confusion, even though the parties extensively briefed the issue of likelihood of confusion, and even though

13

the issue might have provided narrow grounds to decide the preliminary injunction motion. Instead, the District Court proceeded directly to its analysis of functionality, which resulted in extremely broad and unnecessary pronouncements. Op. at 453-55.

The courts have used "functionality" in two ways: utilitarian functionality and aesthetic functionality. 1 MCCARTHY § 7:67 at 7-188 and § 7:79 at 7-240 (separately analyzing the doctrines of "utilitarian functionality" and "aesthetic functionality"). In its utilitarian sense, the functionality defense prevents a manufacturer from using trademark law to obtain a potentially perpetual monopoly over a useful product feature that is (or could be) protected by a limited-term patent. *Qualitex*, 514 U.S. at 164-65. The basis of the functionality defense is that competitors must be permitted to use a utilitarian feature of a product that lowers the manufacturing cost of the product, raises its quality, or is "essential to [its] use or purpose." *Id*.

As the District Court noted, a color is deemed functional if it "is essential to the use or purpose of the product" or if it "affects the cost or quality of the product." Op. at 450 (citing *Qualitex*, 514 U.S. at 165). But, although the District Court paid lip service to the test for utilitarian functionality, it did not correctly apply this test.

A.    *The "Essential to the Use or Purpose" Prong*

Under this prong, the question is whether the *particular feature* claimed as a trademark is "essential to the use or purpose" of the *particular product* upon which it is used. *Qualitex*, 514 U.S. at 165. In other words, the analysis is whether the

14

Red Sole Mark is "essential to the use or purpose" of the Louboutin shoes on which it appears.

A design feature of a particular product is essential to the use or purpose of the product "only if the feature is dictated by the functions to be performed; a feature that merely accommodates a useful function is not enough." *Stormy Cline,* 809 F.2d at 975 (quoting *LeSportsac, Inc. v. Kmart Corp.*, 754 F.2d 71, 76 (2d Cir. 1985)); *Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d 1142, 1148 (2d Cir. 1987) ("[T]he true test of functionality is not whether the feature in question performs a function, but whether the feature is dictated by the functions to be performed" by the product at issue); *see also* 1 MCCARTHY § 7:69 at 7-196.  Here, the District Court did not analyze whether the Red Sole Mark is essential to the use and purpose of Louboutin's footwear.

The District Court did not explain how the function of a shoe "dictates" that the sole be covered entirely in red lacquer.  And it is hard to imagine how such a conclusion could be reached—a shoe would seem to serve the same function regardless of the color of its sole.

Rather than properly analyze whether the Red Sole Mark is essential to the use or purpose of Louboutin's shoes, the Court instead appears to have conducted another sweeping analysis of the "fashion industry" generally—concluding that color *in general* is purportedly a "critical attribute" and an "indispensible medium" in the fashion world as a whole and, thus, the law purportedly "cannot exclude the use of an ornamental or functional medium necessary for the freest and most productive artistic expression by all engaged in the same enterprise."  Op. at 452-

53.   In short, it appears the District Court concluded that the use of a "single color" for "fashion items" is *per se* essential to the use and purpose of fashion items and, thus, is *per se* functional.

But the proper analysis for functionality is not the sweeping question of whether single colors *as a whole* are essential to the use or purpose of "fashion items."  The question is whether, in the particular context at issue in this case, the Red Sole Mark is essential to the use or purpose of Louboutin's shoes—*i.e.*, whether the function to be performed by Louboutin's designer footwear "dictates" that their soles be covered in a red lacquer.  *Stormy Cline*, 809 F.2d at 975.[2]  The holding that single colors are *per se* functional when used on "fashion items" should be rejected by this Court.  In fact, the Second Circuit has already warned against the adoption of *per se* functionality rules.  *See Villeroy & Boch Keramische Werke K.G. v. THC Sys. Inc.*, 999 F.2d 619, 621 (2d Cir. 1993) (holding that "the design of hotel china is not *per se* functional.")

B.    *The "Affects the Cost or Quality" Prong*

The District Court concluded that the Red Sole Mark "affects the cost and quality of the [Louboutin] shoe."  Op. at 454.  But, again, the District Court did not correctly apply this legal test.

---

[2] Indeed, in the proceedings below, Defendants acknowledged in their preliminary injunction opposition brief that the functionality inquiry must be analyzed "in the particular context at issue" in the case.  *See* District Court Dkt. No. 33 at p. 10 ("The key question then is whether, *in the particular context at issue*, color is "essential to the use or purpose of the article or if it affects the cost or quality of the article . . . .") (emphasis added).

"[A] design feature affecting the cost or quality of an article is one which permits the article to be manufactured at a *lower cost* or one which constitutes an *improvement in the operation of the goods*."  *Stormy Cline*, 809 F.2d at 975 (emphases added); *see also Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 122 (1938) (pillow shape of shredded wheat biscuit deemed functional because, *inter alia*, the shape permitted the biscuit to be produced at a lower cost than if another shape was used) (cited with approval in *Qualitex*, 514 U.S. at 165).

Ignoring this precedent, the District Court held that the Red Sole Mark "affects the cost of the [Louboutin] shoe" because "adding the red lacquered finish to a plain raw leather sole" made the production of the shoe "*more expensive*, not less."  Op. at 454 (emphasis added).   This analysis turns the "affects the cost" prong of the functionality test on its head.  If the use of a trademarked feature makes a product *more* expensive to produce, this demonstrates that the feature is *not* a functional element that competitors need in order to compete.  Indeed, the District Court admitted that its conclusion that the Red Sole Mark "affects the cost" of the Louboutin shoes is "not . . . the way *Qualitex* envisioned" that prong being analyzed.  Op. at 454.

As to the "affects the quality" prong of the functionality test, the District Court does not appear to have conducted any analysis.  The District Court's opinion does not explain how, if at all, the Red Sole Mark constitutes an "improvement in the operation" of Louboutin's shoes.  *Stormy Cline,* 809 F.2d at 975.  In fact, it is difficult to imagine how the Red Sole Mark could function as an improvement of the operation of Louboutin's designer footwear—the shoes would

operate in the same manner regardless of the color of the soles. *Accord Vuitton Et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 776-77 (9th Cir. 1981) ("Vuitton luggage without the distinctive trademark would still be the same luggage. It would carry the same number of items, last just as long, and be just as serviceable.").

In sum, in concluding that the Red Sole Mark was functional, the District Court failed to apply the correct legal standards enunciated by the Supreme Court and the Second Circuit and instead improperly adopted a sweeping rule that the use of a single color as a trademark on fashion items is *per se* functional.

## IV. To The Extent the Court Found the Red Sole Mark To Be Aesthetically Functional, It Incorrectly Analyzed this Defense

In contrast to utilitarian functionality, the concept of "aesthetic functionality" considers whether purely aesthetic features of a product may be deemed "functional" because these aesthetic features "are essential to effective competition." *Wallace Int'l Silversmiths*, 916 F.2d at 80.

Although the District Court's opinion does not use the phrase "aesthetic functionality," the District Court's opinion could be read as implicitly invoking this doctrine. Specifically, the District Court stated that "aesthetic appeal *can* be functional; often we value products for their looks," (Op. at 453), as well as how color in general in the entire "fashion industry" serves "aesthetic functions vital to robust competition." Op. at 449. Accordingly, *amicus curiae* believe it appropriate to examine the aesthetic functionality doctrine in the Second Circuit and whether the District Court applied it correctly.

18

The controlling case in the Second Circuit on the doctrine of "aesthetic functionality" is *Wallace International Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76 (2d Cir. 1990); *see Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1105-06 (2d Cir. 1995) (standard for aesthetic functionality is the standard announced in *Wallace*). In *Wallace*, the Second Circuit rejected the broad view of aesthetic functionality that had been adopted by the Ninth Circuit, namely that an aesthetic element of a product that served as a trademark would be deemed functional if the aesthetic element was "an important ingredient in the commercial success" of the product. *Wallace*, 916 F.2d at 80 (discussing and rejecting *Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir. 1952)). According to the Second Circuit, the *Pagliero* standard for aesthetic functionality impermissibly allowed the "commercial success of an aesthetic feature [to] automatically destroy all of the originator's trademark interest in it, notwithstanding the feature's secondary meaning and the lack of any evidence that competitors cannot develop non-infringing, attractive patterns." *Id.*

Instead, the Second Circuit adopted a clear and limited test for when the aesthetic functionality defense might apply: "[W]here an ornamental feature is claimed as a trademark and trademark protection would *significantly hinder competition* by *limiting the range of adequate alternative designs*, the aesthetic functionality doctrine denies such protection." *Wallace*, 916 F.2d at 81 (emphasis added); *see also Qualitex*, 514 U.S. at 169 ("[I]f a design's 'aesthetic value' lies in its ability to 'confe[r] a significant benefit that *cannot be practically duplicated by the use of alternative designs*,' then the design is 'functional.'") (quoting

19

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 17 (1993)) (emphasis added). In other words, the relevant inquiry for aesthetic functionality purposes is "whether the use of [the plaintiff's] design feature is necessary for effective competition" in the relevant market. *Villeroy*, 999 F.2d at 621. This standard requires a "finding of foreclosure of alternatives" if trademark protection were granted to the plaintiff's aesthetic design. *Wallace*, 916 F.2d at 81; 1 MCCARTHY § 7:80 at 7-246 ("The Second Circuit adopted the policy . . . that an aesthetic, nonutilitarian feature is barred from trademark protection *only* if there are *no alternative designs available* to competitors.") (emphasis added).

Accordingly, where there is no evidence that a defendant "needs to copy" the particular design to compete in the relevant market, the aesthetic functionality doctrine does not bar trademark protection of the design. *Villeroy*, 999 F.2d at 621 (aesthetic functionality presented no bar where defendant failed to show that it "needed to copy [plaintiff's] design to compete in the market for hotel china" or that it was "at a significant competitive disadvantage . . . without [plaintiff's] pattern"); *Knitwaves*, 71 F.3d at 1006 (aesthetic functionality not a bar to protection of plaintiff's "fall motif" design for sweaters where defendant failed to demonstrate that the number of alternative designs for fall motif sweaters was "limited" or that protection of plaintiff's design would severely restrict defendant's "ability to produce alternative competitive designs.")

Here, the District Court did not analyze whether Defendants "needed to copy" Louboutin's Red Sole Mark in order to compete in the market for designer footwear. Further, the District Court did not analyze whether protection of the

specific Red Sole Mark would "foreclose" competitors from developing alternative "non-infringing, attractive patterns" for the soles of their competitive shoes. Finally, the District Court did not analyze whether the field of alternative designs for shoe soles is "limited." As such, there is simply no proper analysis of the aesthetic functionality doctrine in the District Court's opinion.

Instead of conducting the proper analysis, the District Court appears to have relied again on sweeping generalities about the fashion industry as a whole, stating that "[f]ashion is dependent on color," and that color as a whole (not the particular color mark at issue here) is an "indispensable medium." Op. at 454, 452. Based on these broad generalities, the District Court went on to conclude that the use of a single color in fashion is *per se* aesthetically functional because protection of a single color would purportedly "cramp[] what other designers could do" in an industry that is "susceptible to taste, to idiosyncrasies and whims and moods, both of designers and consumers." Op. at 454.

But such speculation and generalizations are not the proper way to analyze an aesthetic functionality defense. The limited question in the aesthetic functionality inquiry is not whether designers in general need to be able to use colors on unspecified products, but whether makers of competitive shoes need to use red soles to compete effectively. The District Court did not conduct this required analysis.

Accordingly, in apparently concluding that the Red Sole Mark was aesthetically functional, the District Court failed to apply the correct legal standard and instead appears to have adopted a rule that the use of a single color as a

trademark on fashion items is *per se* aesthetically functional.  As explained above, the District Court's sweeping analysis should be rejected by this Court.

## CONCLUSION

For the foregoing reasons, Tiffany urges this Court to reject the District Court's adoption of *per se* rules concerning the protectibility and functionality of single colors in the fashion industry, and instead endorse a case-by-case analysis of these issues based on an examination of the particular mark as applied to the particular product involved the litigation.

Dated:  New York, New York          FROSS ZELNICK LEHRMAN &
       October 24, 2011          ZISSU, P.C.


                         By:    /s/ Richard Z. Lehv     
                              Richard Z. Lehv
                              Jason D. Jones
                         866 United Nations Plaza
                         New York, NY  10017
                         Tel.:  (212) 813-5900

                         *Counsel for Amicus Curiae Tiffany*
                         *(NJ) LLC and Tiffany and Company*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,084 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as determined by the word processing system used to generate the brief.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2003 in 14-point, Times New Roman font.


Dated:  New York, New York
        October 24, 2011

                              By:      /s/ Richard Z. Lehv
                                    Richard Z. Lehv
                                    FROSS ZELNICK LEHRMAN &
                                    ZISSU, P.C.
                                    866 United Nations Plaza
                                    New York, NY  10017
                                    Tel.:  (212) 813-5900

                                    *Counsel for Amicus Curiae Tiffany (NJ)*
                                    *LLC and Tiffany and Company*

**STATE OF NEW YORK** )       **AFFIDAVIT OF CM/ECF SERVICE**
                     **SS.**
**COUNTY OF NEW YORK** )

I, Robin M. Zuckerman, being duly sworn, deposes and says that deponent is not a party to the action, is over 18 years of age, and reside at the address shown above, or at 7 West 36th Street, New York, New York 10018.

That on the 24th day of October, 2011, deponent served the within

**BRIEF FOR AMICUS CURIAE TIFFANY (NJ) LLC AND TIFFANY AND COMPANY IN SUPPORT OF APPELLANTS' APPEAL SEEKING REVERSAL OF THE DISTRICT COURT'S DECISION DENYING APPELLANTS' MOTION FOR PRELIMINARY INJUNCTION**

upon the attorneys, and by the method designated below, who represent the indicated parties in this action, and at the addresses below stated, which are those that have been designated by said attorneys for that purpose.

☑     Via the CM/ECF Case filing System. All counsel of record in this case are registered CM/ECF users. Filing and Service were performed by direction of counsel.

Names of attorneys served, together within the names of the clients represented and the attorney's designated addresses.

LEE CARL BROMBERG
McCARTER & ENGLISH, LLP
265 Franklin Avenue
Boston, MA 02110
(617) 449-6500

DAVID HAL BERNSTEIN
JYOTIN R. HAMID
RAYNA S. FELDMAN
DEBEVOISE & PLIMPTON LLP
*Attorneys for Defendants-Counter-Claimants-Appellees*
919 third Avenue
New York, New York 10022
(212) 909-6000

HARLEY I. LEWIN
McCARTER & ENGLISH, LLP
245 Park Avenue
New York, New York 10167
(212) 275-6774

CHARLES D. RAY
McCARTER & ENGLISH, LLP
City Place 1
185 Asylum Street
Hartford, CT. 06103
((860) 275-6774

*Attorneys for Plaintiffs-Counter-Defendants-Appellants*

Sworn to before me this
24th day of October 2011.

MICHAEL KESTAN
Notary Public, State of New York
No. 02KE6140613
Qualified in New York County
Commission Expires Jan. 30, 2014

**ORIGINAL**

18928